Craig Rodgers, Deborah Rodgers, Jerry Abston, Rena Abston, William Bartlett, Christopher Bridges, Stephanie Bridges, Billy Cook, Deborah Cook, Mike Elliott, Dana Elliott, Tony Graves, Gary Martin, Janice Martin, Dirk Phillips, Kelly Phillips, Jeffrey Vaughn, Rick Nail, Eddie Russell, and Marilyn Russell — all property owners and residents in an area known as Sharit Dairy Mini-Farms (hereinafter referred to collectively as "the residents") — filed this action seeking a permanent injunction against Alfred Collins and Joyce Collins, husband and wife, who are also property owners in Sharit Dairy Mini-Farms. The residents sought to enjoin the Collinses from building their proposed residence in Sharit Dairy Mini-Farms in violation of a 100-foot setback from the road that, the residents argued, was applicable to the Collinses' property. The trial court entered a permanent injunction, enjoining the Collinses from building a residence on their property unless the residence was at least 100 feet from the roadway. The Collinses appeal. We reverse.
 Facts
This dispute concerns 30 tracts of land known as Sharit Dairy Mini-Farms located in Gardendale. Dwayne Jeffreys purchased the entire parcel of land from another owner and decided to subdivide the land into lots exceeding 3 acres each with the houses at least 100 feet from the road. According to Jeffreys, under these parameters, he was exempt from Jefferson County's requirements governing the subdivision of property, including the requirements of platting and recording, under Jefferson County, Subdivision and Construction Regulations, art. 2 (1992), which provides, in pertinent part:
 "[T]he following shall not be included with [the] definition [of a subdivision] or be subject to the requirements thereof.
 . . . .
 "2. The division of land into parcels greater than three (3) acres where no street construction is involved. Any further division will require a subdivision plat."
The parties do not dispute that this regulation applies to Jeffreys's lots in Sharit Dairy Mini-Farms and exempts them from the County's requirements governing the subdivision of property.
In preparing to subdivide and sell the tracts of land, Jeffreys had the property surveyed by Raymond Shackleford, a professional engineer and surveyor licensed in Alabama. At Jeffreys's direction, Shackleford divided the land into 30 tracts. Shackleford then prepared a survey of *Page 381 
each tract. At Jeffreys's direction, Shackleford indicated on the individual survey of each tract a 100-foot setback from Sharit Dairy Road for building purposes. Jeffreys stated that he intended the 100-foot building setback to apply to all 30 tracts; he stated that his goal was to create tracts of land "with plenty of elbow room." However, Jeffreys did not record any of the restrictions that he intended to apply to the 30 tracts because, he stated, he was not required to do so because he was exempt from the subdivision and construction regulations of Jefferson County.
Jeffreys conveyed the tracts to various purchasers at various times by warranty deeds. Some of those deeds expressly referenced the 100-foot building setback; other deeds, however, from Jeffreys to purchasers of tracts in Sharit Dairy Mini-Farms did not reference this restriction. Upon the sale of each tract, Jeffreys provided a copy of Shackleford's survey of the tract to the purchaser.
In May 2001, Jeffreys conveyed tract 26 to Jeffrey Durham and his wife, Tracey Durham.[1] The 100-foot building setback was not referenced in the deed conveying tract 26 to the Durhams. However, Jeffreys provided the Durhams a copy of the survey of tract 26, which indicated the 100-foot building setback. The Durhams never built on the tract and eventually put it up for sale.
In late 2003, the Collinses were looking to purchase land in the Gardendale area. In December 2003, they began working with a realtor, Donna Coufield. Coufield showed the Collinses tract 26 in Sharit Dairy Mini-Farms. Coufield and the Collinses visited tract 26 on two occasions, and the Collinses offered to purchase and the Durhams agreed to sell tract 26. Before the closing took place, Alfred Collins requested another survey of tract 26. Coufield arranged for another surveyor, Bill Varnon, to survey tract 26 at Collins's expense. Varnon's survey was dated December 17, 2003. This second survey also indicated that a 100-foot building setback was applicable to tract 26. According to Coufield, a copy of Varnon's survey was delivered to Alfred Collins before the closing.
The Durham-Collins transaction was closed on December 18, 2003. The Durhams conveyed tract 26 by warranty deed to Alfred Collins and Joyce Collins. This deed provided that the conveyance was made "[s]ubject to existing easements, restrictions, set-back lines, rights of way, limitations, if any of record." Additionally, the Collinses were provided a copy of a survey at the closing. The survey indicated the existence of a building setback of 100 feet from Sharit Dairy Road.
In late spring of 2004, the Collinses began construction of their proposed residence on tract 26. The residence was located 37 feet from Sharit Dairy Road.[2] *Page 382 
Gary Martin, one of the residents of Sharit Dairy Mini-Farms, claimed that on or about May 9, 2004, he stopped at tract 26 and discussed the construction on tract 26 and the 100-foot building setback with Alfred Collins. Martin claimed that he again spoke with Collins on May 10, 2004, regarding the construction on tract 26 and the 100-foot setback requirement.[3]
After those conversations, Martin mailed Alfred Collins a letter, by certified mail to what turned out to be an incorrect street address in Lynwood, California.[4] In this letter, dated May 14, 2004, Martin pointed out that the construction of the residence on tract 26 did not comply with the 100-foot building setback. Martin included with his letter a copy of a survey showing the location of the 100-foot building setback line for tract 26.
The residents then contacted Deborah Belcher, an attorney, regarding the location of the Collinses' proposed residence on tract 26. On June 7, 2004, Belcher wrote a letter to the Collinses informing them that they were in violation of the 100-foot building setback applicable to their property. This letter was also sent to the Collinses at the same street address in Lynwood, California, to which Martin's letter had been sent. The residents then consulted another attorney, Douglas Coretti.[5] On June 11, 2004, Coretti wrote to the Collinses on behalf of the residents, informing the Collinses of the 100-foot building setback applicable to tract 26. As did Martin and Belcher, Coretti incorrectly addressed his letter to the Collinses in Lynwood, California, so it is unclear whether the Collinses received that letter.
The residents filed this action on June 14, 2004, seeking an injunction to prohibit the Collinses from completing the building of their residence on tract 26 unless they complied with the 100-foot building setback. All parties stipulated that none of the documents in the chain of title to the Collinses' tract referenced the minimum 100-foot building setback.[6] However, the parties agreed that the survey provided the Collinses at or before the closing referenced that building setback. The residents also claimed that, after the closing but before the Collinses began construction of their residence, the Collinses were provided oral and written notification of the 100-foot setback.
The trial court heard testimony from Dwayne Jeffreys, the developer of Sharit Dairy Mini-Farms; from Donna Coufield, the realtor who sold tract 26 to the Collinses;[7] and from Jeffrey Durham, the previous *Page 383 
owner of tract 26.[8] The trial court also heard testimony from various residents in the development — Gary Martin,[9] Craig Rodgers,[10] Jeffrey Vaughn,[11] and Deborah Cook.[12] Alfred Collins and Joyce Collins also testified.
Two surveyors, Raymond Shackleford and Lawrence Weygand, also testified. Shackleford testified that he acted properly in indicating on the initial surveys of the 30 tracts the existence of a 100-foot building setback based upon nothing more than the instructions of the developer. However, upon cross-examination, Shackleford admitted that, hypothetically speaking, if he were surveying a particular parcel of property, it would be his practice to consult recorded maps, zoning ordinances, and restrictive covenants to determine the existence of easements applicable to the property. Shackleford testified that if he did not locate applicable easements in those sources, he would not show any easements on his survey because he would not have confirmation that any relevant easements existed.
The Collinses called Lawrence Weygand, a surveyor and a civil engineer, as a witness. At the request of the Collinses' *Page 384 
attorney, he prepared another survey of tract 26. On his survey, Weygand did not indicate the location of a 100-foot building setback because, he stated, it would have been improper to do so. Weygand stated that he had no source other than Shackleford's survey to indicate that such a setback existed. Weygand testified that it was his practice to learn of the existence of a setback either from a deed, from a recorded plat, or from other recorded restrictions made applicable to the property. In this case, none of those referenced a 100-foot building setback applicable to tract 26.
Weygand also testified that if he surveyed a parcel of land for an owner who wished to subdivide that land and the owner asked Weygand to indicate a setback line on the survey, Weygand would not do so unless he had a legal document — either a plat recording, restrictive covenant, or a deed — establishing that such a setback had been made applicable to the property he was surveying. In response to this testimony, the trial court stated that, under certain circumstances, a landowner was not required to record a plat or restrictive covenants with the county and that other surveyors obviously would indicate such a setback on their surveys, as Shackleford and Varnon both did.
The trial court entered an order enjoining the Collinses from proceeding with the construction of their residence unless they complied with the 100-foot building setback. The trial court determined that the 100-foot building setback was applicable to tract 26 and to the Collinses because (1) Jeffreys had established a common scheme of development that inured to the benefit of all of the purchasers of tracts within Sharit Dairy Mini-Farms, (2) the other purchasers had observed and abided by the common scheme by building their houses at least 100 feet from Sharit Dairy Road,[13] and (3) the Collinses had actual notice of the common scheme when they purchased tract 26, and they proceeded with the construction at their own risk, in direct violation of the setback requirement.[14] The Collinses appeal.
 Standard of Review
The trial court entered a permanent injunction, and we review de novo the entry of a permanent injunction.TFT, Inc. v. Warning Sys., Inc., 751 So.2d 1238, 1241
(Ala. 1999). However, the trial court also conducted a bench trial at which evidence was presented ore tenus.
 "Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment."
American Petroleum Equip. Constr., Inc. v.Fancher, 708 So.2d 129, 132 (Ala. 1997) (citations omitted). As will be shown, in this case the trial court's findings of fact are clearly erroneous.
 Analysis
The issue before us is whether tract 26 is subject to a 100-foot building *Page 385 
setback — a restrictive covenant.[15] As noted, the parties agree that the chain of title to tract 26 contains no reference to and makes no mention of a 100-foot building setback. Therefore, the covenant the residents seek to enforce is, as to tract 26, not an express one but a restrictive covenant by implication,[16] A restrictive covenant by implication is sometimes referred to as a "reciprocal negative easement" or an "implied servitude."
We note that the existence of an implied restrictive covenant is not to be inferred lightly. This Court has recognized that express restrictive covenants are disfavored under Alabama law and are to be strictly construed, with all doubts resolved in favor of the free and unrestricted use of land and against the covenants. See Whaley v.Harrison, 624 So.2d 516 (Ala. 1993); Lange v.Scofield, 567 So.2d 1299 (Ala. 1990). Logically, if express restrictive covenants are disfavored under the law, implied restrictive covenants are to be viewed with even less favor.
Despite the disfavor with which Alabama law views implied restrictive covenants, this Court has enforced implied restrictive covenants under certain situations. See Hallv. Gulledge, 274 Ala. 105, 145 So.2d 794 (1962);Virgin v. Garrett, 233 Ala. 34, 169 So. 711 (1936);Scheuer v. Britt, 218 Ala. 270, 118 So. 658 (1928). However, in more recent cases, this Court has refused to find an implied restrictive covenant. See Ex parte Frazer,587 So.2d 330 (Ala. 1991); Swanson v. Green,572 So.2d 1246 (Ala. 1990). We discuss at length the development of the law as it relates to implied restrictive covenants in this State so that we may properly analyze this case.
 A. Early Cases Involving Implied Restrictive Covenants
We begin by discussing Sanborn v. McLean,233 Mich. 227, 206 N.W. 496 (1925), which, although not an Alabama case, is credited by some commentators as the original case finding an implied restrictive covenant in a subdivision setting. InSanborn, a developer sold some lots in a subdivision and included in the deeds the restriction that the lots could be used for only residential purposes. At the time of those conveyances, the developer retained certain other lots in the same subdivision. The developer later sold the retained lots, but the deeds to those lots did not include the restrictive language. Many years later, John McLean and his wife, Christine, purchasers of one of the unrestricted lots, attempted to build a gasoline service station on their lot.
The Michigan Supreme Court concluded that the original developer intended to apply the same restrictive covenants to all the lots in the subdivision, including those retained by him and later conveyed by deed that did not include the restrictive language. The Court held that the implied restrictive covenant attached as an equitable burden on each of the lots retained by the developer, whether included as a restriction in the deed or not, and passed to each of the purchasers of those lots as an enforceable servitude. The plaintiffs in *Page 386 Sanborn v. McLean obtained an injunction to prevent the defendants from constructing a gasoline service station on a lot in the subdivision, even though the chain of title to the defendants' lot never expressly referenced or contained the residential restriction. The Sanborn Court stated:
 "This subdivision was planned strictly for residence purposes, except lots fronting Woodward [A]venue and Hamilton [B]oulevard. The 91 lots on Collingwood [A]venue were platted in 1891, designed for and each one sold solely for residence purposes, and residences have been erected upon all of the lots. Is defendants' lot subject to a reciprocal negative easement? If the owner of two or more lots, so situated as to bear the relation, sells one with restrictions of benefit to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained can do nothing forbidden to the owner of the lot sold. For want of a better descriptive term this is styled a reciprocal negative easement. It runs with the land sold by virtue of express fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction. It is not personal to owners, but operative upon use of the land by any owner having actual or constructive notice thereof. It is an easement passing its benefits and carrying its obligations to all purchasers of land, subject to its affirmative or negative mandates. It originates for mutual benefit and exists with vigor sufficient to work its ends. It must start with a common owner. Reciprocal negative easements are never retroactive; the very nature of their origin forbids. They arise, if at all, out of a benefit accorded land retained, by restrictions upon neighboring land sold by a common owner. Such a scheme of restriction must start with a common owner; it cannot arise and fasten upon one lot by reason of other lot owners conforming to a general plan. If a reciprocal negative easement attached to defendants' lot, it was fastened thereto while in the hands of the common owner of it and neighboring lots by way of sale of other lots with restrictions beneficial at that time to it. This leads to inquiry as to what lots, if any, were sold with restrictions by the common owner before the sale of defendants' lot."
233 Mich, at 229-30, 206 N.W. at 497. The Sanborn
Court also concluded that Mr. McLean was charged with notice of the restrictions because of the apparent residential nature of all the buildings in the subdivision:
 "Considering the character of use made of all the lots open to a view of Mr. McLean when he purchased, we think, he was put thereby to inquiry, beyond asking his grantor, whether there were restrictions. He had an abstract showing the subdivision and that lot 86 had 97 companions. He could not avoid noticing the strictly uniform residence character given the lots by the expensive dwellings thereon, and the least inquiry would have quickly developed the fact that lot 86 was subjected to a reciprocal negative easement, and he could finish his house, and, like the others, enjoy the benefits of the easement. We do not say Mr. McLean should have asked his neighbors about restrictions, but we do say that with the notice he had from a view of the premises on the street, clearly indicating the residences were built and the lots occupied in strict accordance with a general plan, he was put to inquiry, and, had he inquired, he would have found of record the reason for such general conformation, and the benefits thereof serving the owners of lot 86 and *Page 387 
the obligations running with such service and available to adjacent lot owners to prevent a departure from the general plan by an owner of lot 86."
233 Mich, at 232-33, 206 N.W. at 498.
In 1928, the Alabama Supreme Court addressed the creation and enforceability of an implied restrictive covenant. InScheuer v. Britt, 218 Ala. 270, 118 So. 658 (1928), the Court stated:
 "Nor is it necessary that the restrictive covenant running with the land should be incorporated in the defendant's deed to take it out of the influence of the statute of frauds; the servitude may be laid on the property by a separate writing, to which he is not a party, if he is in privity with and claiming under one of the parties thereto, and has notice thereof.
 "Here the servitude was laid on the property by the conveyance made by Brown, Duskin 
Heilpern to complainant in pursuance of the general scheme of improvement, affecting not only the lots conveyed to complainant, but unsold lots then held by complainant's grantors, including the lots afterwards sold to the defendant.
 "This doctrine is neither strange nor anomalous, as appears from the numerous authorities collected in the note to 21 A.L.R. pages 1300-1326, and finds a striking analogy in the doctrine, often recognized by the court, that where the owner of land lays it off in lots, blocks, and streets, as a subdivision, and the sale of lots is made in reference thereto, and purchases are made on the faith of the act, this operates as a dedication of the street and gives the several lot owners an easement thereon, and this is so without reference to the statute.
 "On the other hand, it would be strange indeed to hold that one may lay off a subdivision for strictly residential purposes, as a general scheme of improvement, and sell and convey to numerous purchasers on the faith thereof, incorporating in their deeds restrictive covenants as to the use in pursuance of such scheme, that the promoters of the general scheme could destroy the scheme, to the detriment of such purchasers, by selling to others without such restrictions, when they had notice of such general scheme."
218 Ala. at 273-74, 118 So. at 662 (opinion on rehearing) (citations omitted).
In Virgin v. Garrett, 233 Ala. 34, 169 So. 711
(1936), the Alabama Supreme Court again addressed implied restrictive covenants, affirming the trial court's order enjoining Jennie Virgin, Ira Virgin, and Pan American Petroleum Corporation from erecting a filling station or a storehouse on property adjacent to the complainant's residence. In that case, the deeds to all of the properties in question contained the restrictive language, but the developer had attempted to subsequently record a written release of those restrictions. This Court stated:
 "'One of the most practical tests, supported by common sense and common business experience, is, whether the restriction imposed by the grantor or proprietor upon the granted premises would naturally operate to enhance the value of his adjacent premises, whether retained by him or conveyed to another. If this be so, it is a strong circumstance to indicate that the restriction was not intended for the mere personal benefit of the grantor, but as a permanent servitude beneficial to the owner of the land, whoever he may be, and appendant to the premises. Parker v. Nightingale, 6 Allen [Mass.] 341, 83 Am. Dec. 632. The reported cases are numerous, and almost infinite in their phases of variety, where tracts of land in cities are subdivided *Page 388 
into lots, and sold to separate purchasers, subject to restrictions as to the kind of occupations which may or may not be carried on upon them, and even as to the nature and dimensions of the buildings to be erected on the premises. The inquiry, in these cases, has generally been, whether the servitudes or restrictions imposed were of such a nature as to operate as an inducement to purchasers; and, if so, the inclination of the courts has been to construe them as appurtenant to the estate, and intended for the protection, rather than personal to the grantor. If appurtenant, it of course follows the land, being assignable with it, and each grantee can enforce it in equity against each other grantee having notice of it.'"
233 Ala. at 37-38, 169 So. at 713 (quoting McMahon v.Williams, 79 Ala. 288, 291 (1885)). The Court inVirgin v. Garrett also discussed the issue of notice of an implied restrictive covenant:
 "When appellant purchased, she knew of the restriction on her lot in the deed from Cloverdale Homes, as well as in the other deeds, including that to her. But such knowledge is not of itself sufficient to show notice that the restriction when made by Cloverdale Homes was an appurtenance to lot No. 2. But before she purchased, Cloverdale Homes had executed and recorded a release and quitclaim deed reciting that it had sold and conveyed various lots and parcels containing restrictions as to their use and conveyance, and thereby released and quitclaimed to the respective owners of said lots all claims so reserved.
 "This quitclaim deed being on record from one in the chain of appellant's title, in which it is shown that he had reserved an interest, is such as to convey to appellant notice of its contents when she bought lot No. 1, and it appeared upon her abstract of title. It was therefore both constructive and actual notice to her that this grantor had made conveyances of `various lots and parcels of land' with such restrictions. That was a suggestion to her to investigate and see if the deed to lot No. 2 of the same tract had such a restriction. It was executed on a date next after the date of the deed to lot No. 1. That circumstance, and the knowledge that a filling station or store-house would seriously affect the value of lot No. 2 for a dwelling house, and the presumption which we have quoted from McMahon v. Williams, [79 Ala. 288 (1885)], all serve to suggest further inquiry from the owner of lot No. 2 to ascertain whether the restriction in the deed to lot No. 1 was an inducement to the purchase of lot No. 2. Had such inquiry been made, she would have been so informed. She is chargeable as though she made it, and received the information. A restriction may be a convenant [sic] or only a condition subsequent for the sole benefit of the grantor, but when it is imposed for the benefit of the owner of other property, it creates an easement for him, irrespective of its terms. McMahon v. Williams, supra. We think, therefore, that appellee is entitled to an enforcement of the restriction against her."
233 Ala. at 38, 169 So. at 713.
In the 1962 case of Hall v. Gulledge, 274 Ala. 105,145 So.2d 794 (1962), the Alabama Supreme Court held that when an owner of a tract of land adopted a general scheme for the improvement of the land, subdivided that land into lots, and conveyed those lots with uniform restrictions, those restrictions created equitable easements in favor of the owners of all the lots. Hall v. Gulledge involved an area of Jefferson County known as the Redmont Park subdivision. At the time of the law-suit, Hall owned lot 27 in Redmont Park *Page 389 
and Pettus owned lot 14 in Redmont Park.[17] The chain of title for lot 27 included a deed from Redmont Land Company, the developer of the subdivision, to M.C. Stewart, dated December 1, 1924, and the chain of title for lot 14 included a deed from Redmont Land Company to E.L. Ford, dated January 7, 1926. Both deeds included restrictive covenants stating that the lot would not be used for any business or trade, that the lot would be used for residential purposes only, that only one dwelling would be constructed on each lot, and that all dwellings on the lots would comply with a 25-foot setback from the side property lines. The restrictions also reserved to the grantor, Redmont Land Company, the right to change or modify the restrictions applicable to the lots.
In 1950, Redmont Land Company conveyed lots 25 and 26 as a single parcel to Magic City Development. This deed contained the same or similar restrictions to those contained in Hall's and Pettus's deeds. In 1959, Magic City Development conveyed lot 25 to Robbie A. Strickland and conveyed lot 26 to Evelyn Strickland Gulledge.[18] Both lot 25 and lot 26 were adjacent to Hall's lot 27. When Strickland and Gulledge threatened to violate the restrictions, Hall sought a declaratory judgment to enforce the restrictive covenants.
The trial court held that the restrictive covenants were unenforceable against Strickland and Gulledge, and Hall appealed. On appeal, the Alabama Supreme Court reversed and remanded. The Court found that the deed given to Magic City Development by Redmont Land Company imposed restrictive covenants on lots 25 and 26, that those restrictions were for the benefit of Hall against Magic City Development and the subsequent purchasers of its lots, and that the subsequent purchasers had actual or constructive notice of the restrictions. Hall, 274 Ala. at 107,145 So.2d at 795.
In reaching this conclusion, the Court recited at length the law applicable to implied restrictive covenants and discussed earlier cases in which that law had been applied:
"In Scheuer v. Britt, 218 Ala. 270, 118 So. 658
[(1928)], we quoted with approval the following from 4Thompson on Real Prop., §§ 3398:
 "'"Where the owner of a tract of land adopts a general scheme for its improvement, dividing it into lots, and conveying these with uniform restrictions as to the purposes for which the lands may be used, such restrictions create equitable easements in favor of the owners of the several lots, which may be enforced in equity by any one of such owners. Such restrictions are not for the benefit of the grantor only, but for the benefit of all purchasers. The owner of each lot has as appurtenant to his lot a right in the nature of an easement upon the other lots, which he may enforce in equity.
 "'"Whether such restriction creates a right which inures to the benefit of purchasers is a question of intention, and to create such right it must appear from the terms of the grant, or from the surrounding circumstances, that the grantor intended to create an easement in favor of the purchaser."'
 "We further stated: *Page 390 
 "'In such cases the equitable right to enforce such mutual covenants is rested on the fact that the building scheme forms an inducement to buy, and becomes a part of the consideration. The buyer submits to a burden upon his lot because of the fact that a like burden is imposed on his neighbor's lot, operating to the benefit of both, and carries a mutual burden resting on the seller and the purchasers.'
"Quoting from the opinion in the same case on a former appeal it was noted:
 "'"Where a defined district is platted and publicly offered as a restricted district, the restrictive clauses in the several deeds are construed as mutual covenants, each lot subject to a servitude or easement in favor of all the others, including unsold lots of the grantor in the same plat. Such servitude being appurtenant to and running with the land, any subsequent purchaser of the lot within the plat, with notice of the easement thereon, takes it subject thereto, as between himself and other lot owners. . . .'"
"See 60 A.L.R. 1128.
"Again, in Virgin v. Garrett, 233 Ala. 34,169 So. 711 [(1936)], we stated:
 "`It is apparent that the inquiry involves two questions: (1) Did the restrictions attach as appurtenant to Lot No. 2, and run with it? (2) Did appellant have notice of its existence as such appurtenance when she purchased part of Lot No. 1?
 `. . .
 "`The question of law which exists in such cases is whether or not the grantor in the deed containing the restriction agreed expressly or impliedly that the restriction is for the benefit of the owner of the other property in [the] subdivision, whether it had been sold or not. Such a contract may be inferred from the circumstances and terms of the instrument, and need not be expressed either verbally or in writing. The test is said to be the intention of the grantor in creating the restriction. . . . That intention may be proven as is any other fact in the light of legal presumption or precedents.'"
Hall, 274 Ala. at 109-10, 145 So.2d at 798.
Twenty-eight years later, in Swanson v. Green,572 So.2d 1246 (Ala. 1990), the issue of implied restrictive covenants arose again. In Swanson v. Green, Charles and Mary Swanson, along with numerous other landowners in the Rolling Acres subdivision (collectively referred to as "the Swansons"), sued Charles and Annie Green and W.C. and Shirley Holladay, all of whom owned land in the Rolling Acres subdivision. The Swansons sought to enjoin the Greens and the Holladays from engaging in commercial activity on their property based on a restrictive covenant contained in previous bonds for title issued on all of their property.
The evidence presented to the Court indicated that in 1971 the Holladays purchased one lot in the Rolling Acres subdivision through a bond for title.[19] That bond for title included restrictive language *Page 391 
providing that "[n]o commercial business shall be conducted on the property." 572 So.2d at 1247. The Holladays received a deed to the property in 1973. However, that deed did not include the restrictive language found in the bond for title, and the deed did not reference that restrictive language in any way. Both the bond for title and the deed issued to the Holladays were recorded in the proper probate office. At some point, the Holladays began operating an automobile repair business on their property.
In April 1971, T.S. and Emma Carpenter purchased a lot in the Rolling Acres subdivision through a bond for title. This bond for title contained the same restrictive language found in the Holladays' bond for title. It provided: "No commercial business shall be conducted on the property."572 So.2d at 1247. The Carpenters obtained a deed to the property in 1983; this deed, however, did not mention the restriction on commercial activities. In 1988, the Carpenters sold the property to Charles and Annie Green, conveying the property by a warranty deed, which was silent as to the restriction on commercial activities. The bond for title and the deed given to the Carpenters and the deed given to the Greens were recorded in the appropriate probate office. At some point after they purchased the property, Charles and Annie Green began operating a trucking business on and from their property.
The Swansons sued the Holladays and the Greens, seeking to enforce the restrictive language contained in the bonds for title applicable to their property, arguing that those restrictions were as binding on the Holladays and the Greens as if the same language had been included or incorporated into their deeds.[20] However, the trial court disagreed. The Swansons appealed.
On appeal, this Court affirmed the judgment of the trial court. This Court recognized that the presence of the restrictive language in the bond for title could not substitute for the absence of the restrictive covenant in the subsequent deed; it stated, "[A] deed, as a conveyance of title, is an entirely different instrument from a bond for title." Swanson, 572 So.2d at 1248. The Court continued:
 "The Swansons' argument also ignores the doctrine of merger, which holds that, absent fraud or mistake, when a contract to sell or convey land is consummated by execution and delivery of a deed, that contract becomes `functus officio' and the deed becomes the sole memorial of the parties' agreement. Therefore, a deed, not a bond for title, determines the rights of the parties. Because none of the deeds involved here contains any restrictions regarding commercial activity, the provisions in the bonds for title prohibiting business on the Holladays' property and the Greens' property `merged with' the deeds and are of no effect."
Swanson, 572 So.2d at 1248.
The Swanson Court continued, however:
 "Notwithstanding the failure of the deeds to restrict the Holladays' and the Greens' use of their property, the Swansons could still succeed if they can prove that there was a common scheme to so *Page 392 
restrict commercial activity at the inception of the Rolling Acres subdivision. Generally, a common building scheme may be evidenced by: 1) universal written restrictions in all of the deeds of the subdivision; 2) restrictions in a substantial number of such deeds; 3) the filing of a plat showing the restrictions; 4) actual conditions in the applicable subdivision; or 5) acceptance of the actual conditions by the lot owners. 7 Thompson on Real Property §§ 3163, p. 124 (1962 repl. vol.)."
572 So.2d at 1248. However, the Swanson Court agreed with the trial court that none of these factors supported a finding that a common scheme of development or building existed as to the Rolling Acres subdivision.
A year after it decided Swanson, the Court again addressed the issue in Ex parte Frazer, 587 So.2d 330
(Ala. 1991). Ex parte Frazer involved a large tract of land conveyed by the Oliver Estate, Inc., to Hoyt Henley and Evan Leary by deed in 1965. The Oliver Estate included in the deed restrictive language that allowed Henley and Leary to subdivide the property into 5-acre lots but expressly prohibited any further subdivision of the land for a period of 15 years. Henley and Leary subdivided the property into lots of five acres each and referred to the subdivision as the Bell Estates subdivision. Henley and Leary filed a plat of the subdivision along with the restrictions applicable to the land.
Henley and Leary began selling lots in the subdivision in 1967. None of the deeds given to the purchasers of those lots incorporated the restrictions relating to the size of the lots. None of those deeds contained any restrictions prohibiting resubdivision.
Frazer purchased one of the five-acre lots in 1984. At the time of his purchase, the 15-year restriction against further subdivision of the lots had expired. Before his purchase, Frazer searched the probate court records to determine the applicable plat and deed restrictions for his lot; Frazer found no restrictions applicable to his property. Frazer also consulted with an attorney; the attorney performed his own search of the probate court records and provided an opinion concluding that no restrictions applied to the property. Frazer proceeded with the purchase and then attempted to subdivide his five-acre lot into four lots.
Frazer submitted a proposal to the planning commission for the City of Montgomery, seeking approval of a plat, in which his five-acre lot would be subdivided into four smaller lots, all in excess of one acre each. Although Frazer's proposal complied with all of the City Planning Commission's zoning ordinances and subdivision regulations, including the minimum lot size, use, square footage of residences, and frontage, the Commission rejected Frazer's proposed plat. Frazer appealed to the circuit court, which upheld the decision of the Commission. Frazer appealed to the Court of Civil Appeals; that court affirmed the judgment of the trial court. Frazer then appealed to this Court.
On appeal, the Alabama Supreme Court noted that all the parties had agreed that there were no express restrictions preventing resubdivision of the lots. However, the owners of the other lots in Bell Estates argued that an implied covenant applied to Frazer's property. The owners of the other lots argued that the implied covenant forbade any resubdivision of the property because the common grantors of the land, Henley and Leary, had intended the original restriction against further subdivision to run with the land. The other owners argued that a negative reciprocal easement had attached to all of the lots *Page 393 
based on the 15-year covenant included in the deed from the original grantor.
This Court disagreed and reversed the judgment of the Court of Civil Appeals. The Court held that Frazer's lot was not encumbered by a reciprocal negative easement prohibiting further resubdivision. The Court stated that an implied covenant will not be found to exist in an instrument when that same instrument contains an express covenant of a different or contradictory nature. The Court added:
 "There is a more compelling reason why the five-acre limitation cannot be upheld by implication. Frazer did not purchase the property from the original developers. The developers purchased the property from the Oliver Estate, and the Oliver Estate deed expressly imposed a restriction on lot size that was to expire after 15 years, which was 1980. The developers did not include this restriction in the restrictions filed with the subdivision plat of the property. Even if they intended the restriction to extend beyond 1980, Frazer had no way of knowing that that was their intent. He bought his property in 1984 from persons other than the developers. A title search revealed that there were no restrictions with regard to further subdivision of the property. In Powell on Real Property, Part IV, §§ 678 (1988), it is stated: `The mutual intent of the original promisor and promisee governs the duration of covenants as to land use.'
 "Frazer was not an original promisor or promisee. There is in this record no evidence that Frazer had actual or constructive notice of the existence of any restriction with regard to lot size at the time he purchased his property. In order for an implied restrictive covenant to be enforced against a purchaser, the evidence must show that he had knowledge of the restriction at the time he purchased the property. . . .
 "This court has frequently held that where a property owner complies with all applicable ordinances and regulations, he may not be denied a legal use of his land merely because adjoining landowners object to that use. . . .
 "The ownership of land carries with it the right to use the land for any lawful purpose. This does not mean that the city may not legally restrict the use of land. But when it does so, it must clearly apprise landowners of what those restrictions are, and it must adopt standards that can be uniformly applied and that give reasonable notice to the owner of what he must do to comply with those restrictions. . . ."
587 So.2d at 332.
 B. Application to the Instant Case
After lengthy consideration of the issues in this case, we conclude that the trial court's judgment must be reversed. As noted earlier, the deed provided by Jeffreys to the Durhams, the Collinses' predecessors in interest to tract 26, did not reference the building setback. In fact, it is undisputed that the Collinses' chain of title does not reference the building setback at all.
Additionally, the evidence in this case does not indicate that Jeffreys had established a common building or development scheme in Sharit Dairy Mini-Farms. Alabama has recognized that
 "a common building scheme may be evidenced by: 1) universal written restrictions in all of the deeds of the subdivision; 2) restrictions in a substantial number of such deeds; 3) the filing of a plat showing the restrictions; 4) actual conditions in the applicable subdivision; or 5) acceptance of the actual conditions by the lot owners." *Page 394 
Swanson v. Green, 572 So.2d at 1248 (citing 7Thompson on Real Property §§ 3163, p. 124 (1962 repl. vol.)).
Implicit in the caselaw summarized above and in the concept of an implied restrictive covenant is the requirement that the implied covenant must attach to the property in question while the property is held by the common grantor. If the implied restrictive covenant does not attach to and run with the land when the common grantor first conveyed some of the lots and retained the lot in question, the restrictive covenant cannot attach at a later time.
In this case, the relevant point in time is when Jeffreys, the common grantor of all of the tracts in Sharit Dairy Mini-Farms, conveyed tract 26 for the first time. Thus, in order to determine whether an implied restrictive covenant attached to tract 26, we analyze the circumstances and conditions as they existed when at the time Jeffreys conveyed tract 26 to the Durhams rather than when at the time the Durhams conveyed tract 26 to the Collinses.
In order to do this, we first summarize in chronological order the conveyances of the lots in Sharit Dairy Mini-Farms documented in the exhibits submitted to this Court with the record:
 (1) Conveyance from Jeffreys to Wade Bennett and Tracy Bennett, dated March 23, 2000; deed contained no reference to a building setback.
 (2) Conveyance from Jeffreys to Jeffrey Vaughn, dated December 13, 2000; deed contained no reference to a building set back.
 (3) Conveyance from Jeffreys to Phillip Ackerman and Cathy Ackerman, dated February 8, 2001; deed contained no reference to a building setback.
 (4) Conveyance from Jeffreys to Lewis Lacey and Patsy Lacey, dated February 21, 2001; deed contained no reference to a building setback.
 (5) Conveyance from Jeffreys to Hazel Creel, dated March 2001; deed referenced a 100-foot building setback.
 (6) Conveyance from Jeffreys to Herbert Phillips and Kelly Phillips, dated March 28, 2001; deed referenced a 100-foot building setback.
 (7) Conveyance from Jeffreys to Ryan Bolus and Sharon Bolus, dated April 24, 2001; deed contained no reference to a building setback.
 (8) Conveyance from Jeffreys to Jeffrey Durham and Tracey Durham, dated May 8, 2001; deed contained no reference to a building setback.
 (9) Conveyance from Jeffreys to Richard Nail and Karen Nail, dated May 30, 2001; deed contained no reference to a building setback.
 (10) Conveyance from Jeffreys to Eddie Russell and Marilyn Russell, dated July 13, 2001; deed contained no reference to a building setback.
 (11) Conveyance from Jeffreys to Michael Elliott and Dana Elliott, dated August 16, 2001; deed contained no reference to a building setback.
 (12) Conveyance from Jeffreys to Craig Rodgers and Deborah Lynn Rodgers, dated October 18, 2001; deed referenced a building setback.
 (13) Conveyance from Jeffreys to William Dee Bartlett and Bethany Kay Bartlett, dated November lip, 2001; deed referenced a 100-foot building setback.
 (14) Conveyance from Jeffreys to Michael McCarty and Paula McCarty, dated July 2, 2002; deed contained no reference to building setback.
 (15) Conveyance from Jeffreys to Christopher Bridges and Stephanie Lee Bridges, dated November 1, 2002; deed referenced a 100-foot building setback. *Page 395 
 (16) Conveyance from Jeffreys to Jerry Abston and Rena Abston, dated January 16, 2003; deed referenced a 100-foot building setback.
[Conveyance from Durhams to Alfred Collins and Joyce Collins, dated December 18, 2003; deed contained no reference to a building setback.]
 (17) Conveyance from Jeffreys to James A Whitlow, dated June 21, 200k; deed referenced a 100-foot building setback.[21]
Thus, we have before us 7 deeds from Jeffreys, the original grantor, that reference the setback (the transactions emphasized above) and 10 that do not. We note that our summary of these exhibits directly contradicts the trial court's findings of fact as stated in the trial court's order, that deeds to 26 of the 30 tracts in Sharit Dairy Mini-Farms referenced the 100-foot building setback.[22] At oral argument before this Court, counsel for both parties acknowledged that the trial court's order, to the extent it purported to set forth the number of deeds that referenced the 100-foot building setback, is simply incorrect.[23] Because the findings of fact in the trial court's order are undeniably erroneous, those findings of fact are not entitled to the presumption of correctness usually provided to a finding based on ore tenus evidence. See American Petroleum Equip. Constr., Inc. v. Fancher, 708 So.2d at 132.
The residents in this case unquestionably cannot establish a common building scheme using methods 1, 2, or 3 of those recognized in Swanson, supra. It is undisputed that Jeffreys, the developer of Sharit Dairy Mini-Farms, did not include the building setback covenant in all eight of the deeds to the tracts sold in the development up to and including the sale to the Durhams. Thus, the first method of demonstrating a common building scheme recognized inSwanson is inapplicable in this case.
Additionally, as evidenced by a review of the exhibits submitted to this Court, when the Durhams purchased tract 26 from Jeffreys, Jeffreys had sold seven other tracts in that same development but he referred to the 100-foot building setback in only two of those deeds. This cannot be described as a substantial number of the *Page 396 
deeds; therefore, the second method recognized inSwanson, supra, is inapplicable. Jeffreys also failed to include a reference to the building setback in the deeds to the first four tracts conveyed in the development.
It is also undisputed that Jeffreys did not file a plat of the development to place the public on notice of the restrictive covenant. As the trial court noted, under the applicable subdivision regulations for Jefferson County, Jeffreys was not required to file a plat in order to subdivide his property for development. However, this regulation does not, and could not, address the creation of implied restrictive covenants and under what circumstances those covenants would run with the land and be enforceable against subsequent purchasers. Because Jeffreys did not file a plat of his restrictive covenants, the third method recognized inSwanson is inapplicable to show a common building or development scheme.
We are left with only two possible methods by which the residents could establish that Jeffreys developed Sharit Dairy Mini-Farms under a common building scheme: 4) the actual conditions in Sharit Dairy Mini-Farms, or 5) acceptance of the actual conditions by the lot owners. However, the record does not indicate the actual conditions existing when the Durhams purchased tract 26 from Jeffreys. Likewise, there is no evidence as to whether all of the owners at the time of the Durhams' purchase accepted the implied restrictive covenant.[24] For these reasons, we are unable to address in this case factors four and five recognized inSwanson.
 Conclusion
Tract 26 is not subject to a 100-foot building setback. We reverse the trial court's judgment and remand the case for proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, HARWOOD, BOLIN, and PARKER, JJ., concur.
LYONS and SMITH, JJ., concur in the result.
NABERS, C.J., and WOODALL, J., dissent.
[1] Based on the exhibits submitted to this Court, the conveyance to the Durhams was Jeffreys's eighth conveyance of a tract in Sharit Dairy Mini-Farms.
[2] The record indicates that there was a significant "drop-off" on the rear of tract 26. Testimony was presented to the trial court indicating that, in order to build a residence on tract 26 at least 100 feet from Sharit Dairy Road, the residence would have to be designed around the severe slope of the property. An engineer testified that this could be done by incorporating features such as a daylight basement and by designing a multi-storied structure. Alfred Collins testified, however, that he and his wife intended to live in their residence on tract 26 for the remainder of their lives, that they were in poor health, and that they did not wish to build a tall, multi-storied residence on their property. For these reasons, the Collinses selected a site for their residence on tract 26 nearer the roadway to accommodate a two-story residence.
[3] Martin testified that the footings for the house were being dug when he had these conversations with Alfred Collins.
[4] Martin testified that he had obtained the California address for the Collinses from the building permit posted on tract 26. At trial, it was established that the address to which Martin sent the letter was incorrect. Although incorrectly addressed, the letter was received by the Collinses or, at least, the return-receipt card attached to that certified letter bore a signature purporting to be that of Alfred Collins.
[5] Coretti served as counsel for the residents at the trial; he also represents the residents on appeal.
[6] At the trial, it was undisputed that no curbs existed along Sharit Dairy Road, that deep culverts ran alongside Sharit Dairy Road at certain points and that the roadway curved at various places. Several witnesses testified that, because of these conditions, they did not know the proper method of determining the exact 100-foot building setback, while other witnesses testified to differing methods of determining the proper location for the setback.
[7] Coufield testified that she and the Collinses visited tract 26 on two occasions. Coufield testified that, on the second visit, she showed Alfred Collins the survey she had obtained from Durham, and she gave Alfred Collins a copy of that survey. According to Coufield, the 100-foot building setback was shown on the survey she gave to Collins. Coufield testified that she and Collins discussed the 100-foot building setback when they visited the property.
[8] Jeffrey Durham testified that, at the closing, he gave Collins a survey of tract 26 and that the survey referenced the 100-foot building setback.
[9] Martin is a homebuilder who testified that, at the time of the trial below, he was constructing a residence on one of the 30 tracts in Shark Dairy Mini-Farms. Martin testified that he had received the deed to his property around 2002. However, the transcript indicates that Martin referred to a photograph of the residence he was constructing in Sharit Dairy Mini-Farms; the photograph was inexplicably dated 1994. Martin testified that this residence was being constructed to sit more than 100 feet from Sharit Dairy Road because of the building setback contained in his deed. Martin also testified that the deed to his tract referenced the 100-foot building setback, and, according to the transcript, Martin appeared to read the pertinent language from that deed. However, the record and accompanying exhibits submitted to this Court do not contain a copy of the deed to Martin's property.
[10] Rodgers lives on one of the 30 Sharit Dairy Mini-Farms tracts. Gary Martin built Rodgers's house. Rodgers obtained the deed to his tract on October 18, 2001. Rodgers testified that Martin had also built residences in Sharit Dairy Mini-Farms for the Abstons and the Phillipses. Rodgers testified that he had visited all of these homes and that they were all built more than 100 feet from Sharit Dairy Road. Counsel for the residents also presented various surveys of other tracts of property located in Sharit Dairy Mini-Farms to Rodgers, and Rodgers identified the owners of those tracts. Based on the tract, Rodgers testified that each of the residences constructed on those tracts was built more than 100 feet from Sharit Dairy Road. Counsel for the Collinses objected to this testimony each time on the basis of hearsay and improper authentication. The trial court overruled the objections.
[11] Vaughn and his wife own tract 27 in Sharit Dairy Mini-Farms; they obtained the deed to this tract on May 8, 2001. This tract is located next to tract 26. At the time of trial, their residence, located 177 feet from Sharit Dairy Road, had been completed for approximately four months. Vaughn testified that if the Collinses complete their construction as proposed, the Vaughns would be looking into the back of the Collinses' house.
[12] Deborah Cook is an experienced homebuilder who has built two residences on Sharit Dairy Road. The first residence, located in Sharit Dairy Mini-Farms, is over 580 feet from Sharit Dairy Road. She testified that she relied on Jefferson County's zoning department and on her survey to inform her of any setbacks applicable to her property. Cook has built another home on Sharit Dairy Road, although this second residence is not one of the 30 tracts at issue in this case. This second residence is located only 75 feet from the roadway.
[13] The trial court noted that, at the time it entered its judgment, 16 residences had been completed and were occupied in Sharit Dairy Mini-Farms.
[14] In reaching this conclusion, the trial court did not cite any Alabama precedent or authorities. As support for its ruling, the trial court cited treatises and caselaw from other jurisdictions.
[15] "A covenant is an agreement or promise of two or more parties that something is done, will be done, or will not be done. In modern usage, the term covenant generally describes promises relating to real property that are created in conveyances or other instruments." 9 Powell on RealProperty, §§ 60.01 [2] (June 2001) (footnotes omitted).
[16] See, e.g., 9 Powell on Real Property §§ 60.031 (June 2001) (discussing implied covenants in general and the requirements that vary by jurisdiction before such covenants are recognized).
[17] The opinion did not indicate from whom Pettus and Hall had taken their title.
[18] Although the Hall opinion did not specify whether the deeds from Magic City Development to Strickland and Gulledge expressly included the restrictive covenants, we presume that the deeds did not, because the opinion went on to discuss implied covenants.
[19] A "bond for title," also known as a "bond for land" or "bond for deed," is defined in Black's LawDictionary as "[a] bond given by the seller of land to a buyer, binding the seller to convey once the buyer tenders the agreed price."Black's Law Dictionary 188 (8th ed.2004). In Swanson v. Green, the Court, quoting the fifth edition of Black's Law Dictionary, defined a "bond for title" as "'[a]n executory or incomplete sale. It is not a conveyance of legal title but only a contract to convey and may ripen into an equitable title upon payment of the consideration.'" 572 So.2d at 1247 (quoting Black'sLaw Dictionary 162 (5th ed.1979)) (emphasis omitted).
[20] The opinion does not expressly indicate whether a plat of the Rolling Acres subdivision had ever been filed. However, the trial court and this Court both concluded that the Swansons could not establish that a common building scheme had been used in the subdivision. One method by which the Swansons could have shown that the developers established a common building scheme was the filing of a plat indicating the restrictions applicable to the development. Because the Court held that the Swansons could not meet this standard, we presume that no plat was filed.
[21] Although only the first eight conveyances are relevant to our analysis of the issue presented here, we summarize for the reader all of the deeds presented as exhibits to this Court. Additionally, we note that 18 different deeds were included in the exhibits submitted to this Court. However, those 18 deeds represent conveyances of only 17 tracts, because tract 26 is represented twice — once by a conveyance from Jeffreys to the Durhams and then again by a conveyance from the Durhams to the Collinses.
[22] Even if we had all 30 of the deeds to the tracts in Sharit Dairy Mini-Farms before this Court, they could not support the trial court's finding of fact on this point because we know at least 10 of the 30 deeds do not reference the building setback.
[23] The exhibits submitted to the trial court were either not delivered to or were misplaced by the circuit court clerk. The parties attempted to reconstruct the exhibits and submitted copies of certain exhibits to the circuit court clerk, who then included those exhibits in the record delivered to this Court. The trial transcript refers to certain exhibits that were not included in the exhibits submitted to this Court. This Court cannot consider materials that are not before it.
However, because of the difficulties experienced in reconstructing the record, before oral argument this Court specifically pointed out to the parties the discrepancy between the record and the trial court's order. The Court asked the parties to explain, if possible, that discrepancy. At oral argument, counsel for both parties acknowledged that the trial court's order, as it related to the number of deeds referencing the building setback, was simply erroneous. They had no explanation for the error. 
[24] The record contains no evidence addressing the conditions as they existed at the time Jeffreys conveyed tract 26 to the Durhams. Additionally, at oral argument, counsel for the residents confirmed that the evidence and testimony presented to the trial court did not address this issue. We also note that there is no evidence to establish whether any, all, or none of the other owners were in compliance with the 100-foot building setback at the time Jeffreys conveyed the property to the Durhams. We express no opinion whether evidence of such acceptance would have been sufficient to establish an implied restrictive covenant under the facts of this case.