Rel: May 17, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

_____

### SC-2023-0341
_____

### F Family South, LLC

### v.

### Property Owners Association of Ono Island, Inc.

### Appeal from Baldwin Circuit Court
### (CV-19-901602)

SHAW, Justice.

F Family South, LLC ("FFS"), the plaintiff/counterclaim defendant

below, appeals from a judgment in favor of Property Owners Association

of Ono Island, Inc. ("the POA"), the defendant/counterclaim plaintiff in this property dispute. We affirm that judgment in part, reverse it in part, and remand.

Facts and Procedural History

Ono Island is a natural barrier island in Baldwin County. In 1969, Ono Development Company, Inc. ("Ono Development"), began developing Ono Island into a single-family residential subdivision. In September 1970, it filed a "Declaration of General Covenants and Restrictions Applicable to Ono Island Subdivision" ("the general covenants"). The general covenants expressed both Ono Development's intention to create "a community with … canals … and other common areas and common facilities for the benefit of [the Ono Island] community" and its desire "to provide for the preservation of the values and amenities … and for the maintenance of said … canals … and other common areas and common facilities." The general covenants further explained that Ono Development had formed the POA "for the … preservation of the values and amenities in said community." The general covenants defined "[t]he Properties" to which they were intended to apply as including "all those parts of Ono Island … of which a plat of

subdivision, duly recorded has been executed by Ono Development … or to which Ono Development … has given its approval … and such additions thereto." They excluded from that definition "[l]ands not included within the perimeter boundaries of a recorded plat executed or approved by Ono Development … unless and until the same are annexed." The general covenants further created an Architectural Control Committee ("the ACC") and granted it the power to permit or approve construction and maintenance of all structures upon the properties subject to the general covenants and/or adjacent waters. Finally, the general covenants explained that portions of Ono Island, following future development, could also be subject to additional "[l]ocal [c]ovenants and [r]estrictions."

In 1981, Ono Development secured a permit from the U.S. Army Corps of Engineers ("the Corps") authorizing its construction of a series of inland canals on Ono Island intended to provide water access to interior lots that would front on the canals and were slated for development. It is undisputed that the subsequent canal excavation resulted in the creation of, among others, an unnamed, undeveloped "intertidal mound" or island ("the island") at the intersection of two of

the planned canals designated as "Canal B" and "Canal B-1."[1] The nature and current ownership of the island is at the heart of the parties' dispute. According to the POA, the island, as an intertidal mound, was intentionally "planned and constructed near the center of said canals" as "an essential component of the Ono Island Canal System," which, it maintains, was permitted for construction by the Corps and was expected to continue in use contingent upon perpetual monitoring and maintenance of water quality and stability.

Ono Development later conveyed to Frank J. Caron for subdivision and development a parcel of property along Canal B and Canal B-1; that conveyance was made subject to the general covenants. In 1985, Caron recorded a plat of residential lots fronting Canal B or Canal B-1, which was designated "Ono Island Subdivision Unit 14" ("Unit 14"). Ono Development separately recorded a second plat at around that same time creating "Ono Island Subdivision Unit 15" ("Unit 15"). Corresponding "Local Covenants and Restrictions Applicable to Ono Island Subdivision Unit Fourteen" and "Local Covenants and

---

[1]Various intertidal mounds are depicted on and specifically contemplated by the canal permit issued to Ono Development as "filter mounds … to reduce sheet flow into the canals."

Restrictions Applicable to Ono Island Subdivision Unit Fifteen" were filed at or around the same time; those local covenants specifically adopted by reference the general covenants and made all construction of any structure on the covered property and/or within the canals subject to approval by the ACC.

In 1987, Ono Development conveyed to Randall L. Patterson for subdivision and development a parcel of property that was contiguous to the lots in Unit 14 and joined the Unit 14 lots at the centerline of Canal B and Canal B-1; this parcel included the island. The deed specifically referenced and made applicable to the property conveyed to Patterson, which, again, included the island, both the recorded local covenants applicable to Unit 15, specifically, and the general covenants. In 1993, Patterson conveyed, again subject to those covenants, the property he had received via the 1987 deed to Ono-St. John, Inc. ("Ono-St. John"). At or around that time, Ono-St. John recorded a plat creating the Ono-St. John Subdivision on the parcel. The legal description on the plat apparently omitted certain property transferred to Patterson by the 1987 deed -- including the island (i.e., the island does not appear on the recorded plat). Again, a corresponding "Declaration of Local Covenants

5

and Restrictions Applicable to Ono-St. John Subdivision" recorded at that time reflected that the Ono-St. John Subdivision was subject to and burdened by the general covenants and by the local covenants applicable to the Ono-St. John Subdivision.

Following the 1987 transfer to Patterson and by at least 1991, the island was, in apparent keeping with the standard operating procedure of the Baldwin County Revenue Commissioner, assigned an identifying parcel number for tax purposes and was to be assessed for ad valorem property taxes. Ono-St. John was formally dissolved in October 1993. In 1995, as the result of Ono-St. John's failure to pay the 1994 annual ad valorem taxes on the island, the revenue commissioner purportedly sold the island to Duong Hoang, a nonparty to this action. As explained in more detail below, the validity of the tax sale to Hoang is disputed.

In 1998, Ono Island Canal Owners Association, Inc. ("the COA"), a nonprofit corporation, was organized for the primary purposes of "maintain[ing] and improv[ing] the canal system in the Ono Island Subdivision." As defined in the COA's articles of incorporation, its membership included all owners possessing fee-simple title to a lot contiguous to one of the canals within the canal system. Ono

Development subsequently assigned to the COA administration of the canals and transferred to the COA the assets and responsibilities of a trust initially created for that purpose.

Hoang obtained a tax deed to the island in 1998. In 2015, a new entity called "Ono-St. John, Inc." ("OSJ") was formed;[2] OSJ purchased the island from Hoang. The deed from Hoang to OSJ specified that the conveyance was "subject … to" both the Unit 15 local covenants and the general covenants and further indicated that the island was transferred subject to the "[r]ights of others in and to the use of the canals and waterways" and to a reserved "[c]anal easement."

In 2016, OSJ applied to the Corps for a permit to construct on the island a boat shelter and walkways. In May 2019, OSJ obtained, over the objections of the POA, the COA, the ACC, and nearby property owners, the requested permit allowing it to construct "an incised boat slip and boat shelter" on the island and then entered into a related

---

[2]OSJ was apparently formed for the sole purpose of acquiring title to the island. It used the same name as the earlier, dissolved corporation mentioned above despite an apparent lack of any affiliation with that dissolved corporation.

7

construction contract.[3]  OSJ then transferred both the island and the permit to FFS.

In October 2019, when construction work on the planned boat shelter ostensibly began, the contractor was initially approached by and later received a "Stop Work Order" from the ACC informing FFS that construction work was not permitted within the canal system without the prior approval of the ACC and the COA.  As a result, FFS filed in November 2019 a verified complaint against the POA in the Baldwin Circuit Court seeking, among other remedies, various forms of injunctive relief.  In that complaint, FFS contended that the POA lacked "jurisdiction" over the island, that FFS would be irreparably harmed if the stop-work order was permitted to stand, that it lacked an adequate legal remedy, and that it had a reasonable chance of succeeding on the merits.  Accordingly, FFS sought the entry of a temporary restraining order followed by more permanent injunctive relief.  In addition, FFS's complaint included claims of contractual interference and negligence, as well as related demands for compensatory and punitive damages.

---

[3]OSJ did not seek a permit from the POA or the COA.

The POA filed an answer and counterclaim.[4] The POA maintained that the island was subject to restrictions, including the general covenants and/or the local covenants applicable to Unit 14 and Unit 15. Accordingly, it contended that no pier or boathouse could be constructed without the review and approval of the ACC, whose rules provided building and shoreline specifications applicable to any proposed boathouse and prohibited building on any of the intertidal mounds within the canal system. The POA thus asserted a counterclaim alleging that FFS had breached express and/or implied covenants that, it said, govern all canal-fronting lots and any intertidal mound located in the canal system. The POA's counterclaim also separately sought to void the 1995 tax sale of the island to Hoang and to invalidate FFS's title on the ground that the sale was invalid because it allegedly failed to comply with certain statutory requirements. In response, FFS asserted both that the claims

---

[4]The COA and nine individuals owning property fronting the affected canals and located near the island also later successfully intervened in the action. Their claims, however, were not individually addressed below; instead, the trial court treated them as having been "rendered moot" by its later judgment in favor of the POA. (Capitalization omitted.)

in the POA's counterclaim were barred by the rule of repose and that the general covenants specifically excluded the island from their coverage.

The POA later amended its counterclaim to further add that it had, on February 1, 2020, obtained, by means of a quitclaim deed from Ono-St. John,[5] title to the island and to assert a corresponding claim of its purported legal right of "Redemption From Tax Sale" pursuant to § 40-10-83, Ala. Code 1975, in the event that the trial court declined to invalidate the tax sale pursuant to which FFS had obtained title. (Capitalization omitted.)

FFS also later amended its complaint to add, among other additional counts, a request that the trial court "remov[e] all clouds on" its title to the island and quiet title to the island in its name. In that amended complaint, FFS further contended that any purported right of redemption asserted by the POA was barred by both the doctrine of laches and the rule of repose.

---

[5]As noted above, the record indicates that Ono-St. John was dissolved in 1993. It is unclear how the POA obtained the referenced deed, which was executed in February 2020 by the former "Secretary/Treasurer" of Ono-St. John.

The case proceeded to an initial bench trial on the parties' equitable claims. At trial, Jeffrey I. Friedman, a retired real-estate developer and representative of FFS, testified that he had owned property on Ono Island since 1977 when he purchased lots and first constructed a "summer residence." Following construction of the canals, Friedman bought property across the street from that original residence, which fronted the canals. He indicated that FFS now owns eight lots and three residences on Ono Island.

According to Friedman, in 2015 he first became interested in acquiring the island when he purchased "a large boat" and began investigating possible locations to construct a covered boat slip. Friedman ultimately purchased the island from Hoang in 2015 in the name of OSJ. Friedman indicated that he was aware at the time of the purchase that Hoang had acquired title to the island through a tax sale.

After initially applying for the permit from the Corps to allow construction of the planned boat shelter, Friedman indicated that, in 2018, he began considering the idea of also constructing a single-family residence on the island. To that end, Friedman explained, FFS had created an easement over an adjoining property to permit the required

11

utilities, and, he said, barring the current litigation, construction on that residence would have already begun, assuming the necessary permits could be obtained.

On cross-examination, Friedman acknowledged that, for lots subject to the covenants enforced by the POA, he was aware that the construction and repair of boathouses also necessitated a permit from the POA. During his testimony, Friedman disputed being aware that the island was created as part of the canal system, but he acknowledged his prior deposition testimony suggesting that the island was created as part of "the canal ecosystem." He conceded that, from 1984 until 2015, the island had remained "virgin land" and that he had observed no activity occurring there. He further acknowledged that, before OSJ closed on the purchase of the island, he had received an email from the POA explaining its position that building was not permitted on the island and that the island was, instead, a feature intended to promote the health of the canal ecosystem.

Although he indicated that he later concluded that the general covenants and the local covenants were inapplicable to the island, Friedman admitted that OSJ's deed from Hoang specifically indicated

that the island was transferred subject to the general covenants and the Unit 15 local covenants. He further acknowledged that the chain of title from Ono Development to Patterson to Ono St.-John also reflected that the island was expressly subject to the general covenants. Also according to Friedman, he was aware that approval of his permit for the boat shelter by the Corps did not excuse him from obtaining any other necessary approval.

FFS also presented testimony from Shannon Harrison, the POA's administrator and designated corporate representative. She explained that she had authored the email referenced in Friedman's testimony notifying him of the POA's position that the island "was not ever going to be permitted for building … because it's part of the ecosystem of the canal." She further explained that, since the development of the canal system, the island had never been subject to assessment by the POA because "they don't assess unbuildable lots."

Harrison indicated that, historically and currently, the POA's governing documents have defined the properties governed by the general covenants as including all those parts of Ono Island reflected on a duly recorded plat. She further noted that, although the island was

13

included in the written legal description of property conveyed by Ono Development for subdivision, it was not depicted in the accompanying visual representations of the Unit 14 plat, the Unit 15 plat, or the Ono-St. John Subdivision plat. She nonetheless explained: "The [POA] contends that it's a mound, part of the ecosystem that is a part of the whole of Ono Island." Accordingly, Harrison testified to the POA's belief that the Corps' issuance of the 2019 permit to FFS approving construction of a boat shelter on the island was in violation of the original canal permit issued by the Corps. She also noted that there are other portions of the canal system, including "spoils areas," where building is not permitted. She further indicated that there are other privately owned mounds, which although titled as part of a larger platted parcel, are also treated by the POA as unassessable because building on them is not permitted.

Harrison explained that every property owner on Ono Island is a member of the POA and that the property owners whose lots front a canal are also members of the COA as well. She explained that the general covenants were intended to benefit and to encompass all areas of Ono Island, and to preserve its amenities, and had been administered

14

accordingly over the years. According to Harrison, the ACC, which was created by the general covenants, was empowered to engage in preconstruction review of all repairs and/or new construction in the entire geographical area comprising Ono Island and the canal system -- even if a particular area was not included on a subdivision plat. The POA implements rules and regulations governing the ACC specifically and Ono Island generally and possesses the sole discretion to approve any proposed improvement. As to the intertidal mounds, those rules and regulations include provisions intended to protect the mounds and shorelines within the canal system, including expressly prohibiting activity thereon.[6] Harrison testified that that rule has been consistently applied by the POA and by the COA. She indicated that, upon being notified of any prohibited usage, either the POA or the COA typically issues a stop-work order and then takes immediate action to protect the mound.

---

[6]The POA's "Rules and Regulations," as amended in July 2018, specify, with regard to the "canal lots," that "[t]he 'mounds' also known as 'islands' within the Ono Island Canal Systems are to be protected as they were put there to increase the amount of living shoreline in the canal system." They further prohibit any docking or mooring of vessels, walking, playing, parking, or construction of any kind on the mounds.

Harrison explained that, until the present litigation, the POA was unaware that the island was not included on the Ono-St. John Subdivision plat and explained that it had traditionally been treated as subject to all rules, regulations, and covenants. In fact, she indicated that there had never been a time that any parcel on Ono Island had been excluded from the operation of the general covenants. She testified: "The Properties [as defined in and subject to the general covenants] are Ono Island." She again explained that several properties on Ono Island are outside the POA's platted subdivisions but are still subject to the general covenants because the deeds to those properties specifically reference the general covenants. She further indicated that the Ono-St. John Subdivision was, according to its plat, subject to the general covenants, to local covenants specifically applicable to the Ono-St. John Subdivision, and to a reserved canal easement. Specifically, Harrison testified that, pursuant to the local covenants applicable to the Ono-St. John Subdivision, which also run with the land, construction was prohibited without a permit from the ACC. She noted that all lots within that subdivision had been treated as subject to the enforcement power of the POA and all rules and regulations of both the POA and the COA.

Also according to Harrison, the Corps still regulates the canal system in keeping with the conditional terms of the original canal permit to ensure a "living shoreline." She estimated that there were at least five intertidal mounds within the canal system and possibly up to seven, none of which are either improved by buildings or served by utilities. As to the island, she noted that it was originally sand, as demonstrated in photographs taken in 1985, but is now covered with vegetation. Harrison denied that the POA had received reports of any activity occurring on the island until construction began on FFS's boat shelter. After learning that FFS claimed title through a tax deed, Harrison indicated that the POA obtained a quitclaim deed to the island from Ono-St. John and stood ready to redeem the island for the established redemption amount of $734.58.

FFS also presented testimony from Karen Jones, an employee of the Baldwin County Revenue Commissioner's office. According to Jones, the island was assessed for taxes under Hoang's name from 2008 to 2016, under OSJ's name from 2017 to 2020, and under FFS's name from 2021 to the present. Jones also confirmed that the revenue commissioner's records reflected that the tax bill had not been updated from the address

17

of the previous owner (Patterson) to reflect the address for Ono-St. John and that, as a result, the 1994 tax bill had not gone to the address on file for Ono-St. John. In fact, Jones also confirmed that a diligent search of the records failed to reflect that either a tax bill or a delinquency notice was ever delivered to Ono-St. John at its designated address. She also identified other irregularities in the associated publication records and notice regarding the tax sale.

The POA first presented the testimony of Darren Orrell, a licensed land surveyor. According to Orrell, in the early 1980s, Ono Development was his employer's main client. As a result, Orrell estimated that his employer had performed between 90 and 95 percent of all surveying on Ono Island. He indicated that the canal system, which was designed by a "sister" engineering company, was developed to increase the value and number of lots available and was completed before the recording of the subdivision plats. As a result, Orrell explained, the canals appear as easements on the platted lots. He further testified that the canals were a unified system connected by piping and that the canal system is therefore not exclusive to a particular subdivision. Orrell further

explained that an engineer created the idea for the intertidal mounds, as detailed on the original construction drawings.

Orrell, who was also involved in the construction of Unit 14, testified that every subdivision plat referenced the general covenants, any local covenants applicable to the specific subdivision, and the canal easements "to ensure that every property owner knew that this property was restricted … and that other people had certain rights [and] that they could do certain things," including periodic canal maintenance. According to Orrell, although the island was specifically included within the legal description on the deed from Ono Development, the island is not included on the Unit 14 plat, the Unit 15 plat, or the Ono-St. John Subdivision plat. He described the omission of the island from the Ono-St. John Subdivision plat as a "mistake" and indicated that "it should have been included" on that plat as a "common area."

Next, the POA presented testimony from Gena Todia, an environmental consultant who had researched available information regarding the original canal permit and the resulting creation of the canal system. She explained:

> "[I]t's one system, an integral, integrated system interdependent on connectivity and flow of water and … the

> ability of these canals to flush. And great pains were taken to prevent dead ends and stagnant water and ensure that the whole system would flush and flow, and it's all for insuring good water quality in the canals."

Todia estimated that there are approximately 10 man-made intertidal mounds within the canal system, which, she said, were "obviously by design." Todia further explained the ecologically complex nature of the canal system approved in the original canal permit and detailed the extensive efforts the permit required, such as creating a protective marine habitat, including nine miles of "intertidal ecotonal edge" planted with marsh vegetation along the shorelines of the canals and mounds. She noted that the "overarching concern" during the permitting process had been to ensure water quality in the canal system and noted that significant changes to the initial proposal had been required before the permit was approved by the Corps. According to Todia, the most significant changes included the rounding of "corners" and the inclusion of intertidal mounds at each canal intersection. She also confirmed that ongoing, follow-up testing around 1990 suggested that the required "standards are being met and the system is performing as designed." At that point, the regulatory agencies apparently turned over future monitoring to the Ono Island property owners and suggested that

shoreline activity continue to be monitored through enforcement of covenants and/or restrictions to avoid compromising the canal system. She explained that, accordingly, maintenance was, at that point, transferred to the POA and the COA as recommended and that continued compliance with the original canal permit was critical to ensure good water quality and to keep the canal system open.

Todia further indicated that the fact that the Corps had issued a permit to FFS for the boat shelter suggested to her that "they didn't really fully grasp all that went into permitting the canals and what the concerns regarding water quality and what the purpose of the mounds were." According to Todia, no employee of the Corps, the Alabama Department of Environmental Management, or the federal Environmental Protection Agency who was involved in the original permitting process for the canal system was still employed by those entities at the time she undertook her investigation. In fact, she noted that she possessed drawings that the Corps professed not to have seen before issuing FFS's permit. According to Todia, the boat shelter FFS proposed to build was significantly larger than any other existing boathouse on Ono Island. She also explained that it required construction of an underwater bulkhead that, she said, would

21

represent a significant change to the structure of the canal system as originally permitted and constructed and that the proposed height of the boat shelter would impact sunlight on the island and vegetation in the shoreline and shallows.

On cross-examination, Todia defined the intertidal mounds as "these little islands at these intersections that are there to provide more intertidal area surrounding them and an opportunity to create additional marsh … in an effort to ensure good water quality in the canals." Todia noted that, although the island apparently is presently not in conformity with the original canal permit and plans due to natural changes in elevation and vegetation, a significant portion of the island nonetheless serves as an intertidal mound. She explained that, should a water-quality issue arise, the island is present and available to "be modified to do what it was designed to do" through clearing and/or elevation changes -- an option, she explained, that no longer exists once it is developed. In Todia's opinion, "[t]he island as it sits today … is a significant intertidal zone surrounding the higher ground that is ecologically very important" and its removal could be detrimental. Without actual data, she could

22

only predict, with a high degree of likelihood, that the presence of the proposed boat shelter could degrade water quality in the canal system.

Todia did concede that existing boathouses along the canal system have not negatively impacted water quality. She attributed that, at least in part, to the fact that they, unlike FFS's proposed boat shelter, did not require dredging, were shorter than the shelter FFS proposed, and were also located away from the shoreline to promote a shelf of marsh grasses. Todia confirmed that the boat shelter FFS proposed featured 30 feet of flat bottom at a right angle -- rather than the original permitted slope of the canal system -- and would require dredging over 4,000 square feet. She further admitted that she was "second guessing" the Corps' decision to issue the permit for the boat shelter based on her own review of the original Corps permit for the canal system.

Finally, the POA presented testimony from two longtime Ono Island residents, Norm Peterson and Joe Hood, whose lots are located near the island and who offered information regarding its traditional unimproved status. Each further confirmed that he had purchased his lot in reliance on the control and consistency presented by the restrictive covenants.

23

More particularly, Hood, who has resided on a canal-fronting lot in Unit 14 since 1989, explained that he was a prior member of the ACC and a prior president of the POA and was instrumental in founding the COA. Hood, who observed the development of the canal system in the 1980s, indicated that, because of unfavorable water testing during the development of the canal system, it had been questionable whether the canal system would ultimately be successful. Accordingly, because of the threat of canal closure in the original Corps permit, he had waited to move to the canal side of Ono Island until after the Corps determined that the canals would be allowed to remain. Hood further indicated that, in making that move, he had relied on assurances in the covenants that canal maintenance would remain consistent and detailed the "extensive steps" that he and other COA members had taken to continue to protect and maintain the canals.

Regarding the island, Hood noted that while the island was originally clear of vegetation, within five years it was already "heavily vegetated." He explained both that there were no structures located on any of the intertidal mounds throughout the canal system and that, since their construction, the mounds had been treated as an integral part of

24

the canal system both for water-quality requirements and for purposes of "hydrodynamics and the flow of the water."  Hood indicated that in keeping with those purposes of the mounds, the ACC would have rejected a permit request for the planned boat shelter.  Hood also indicated that the rules and regulations governing boathouse construction along the canals were largely based on information provided by the Alabama Department of Fish and Wildlife relating to the monitoring of the wetlands and that the rules and regulations were designed to preserve sunlight for the shoreline vegetation.  Hood further confirmed that there were other existing intertidal mounds that had not been specifically platted but, nonetheless, had still been subjected to all the POA's and the COA's rules and regulations.

Thereafter, FFS presented rebuttal testimony from Barry Vittor, an environmental consultant experienced with the process of permitting waterfront improvements by the Corps.  Vittor disputed that the island was an actual intertidal or estuarine mound, which, he indicated, "would be something that is at least temporarily submerged on a daily basis and provides habitat for marsh grasses."  He did acknowledge, however, that the island could become one with modification.  He also conceded that "it

does provide some intertidal benefit." Based upon his review of the applicable documentation, Vittor also disputed that the bulkhead design for the proposed FFS boat shelter would have any negative environmental or ecological impact and, in fact, opined that it would result in a "more expansive marsh." He did concede that it would eliminate the current gradual slope from the island shoreline into the water at its precise location. But, Vittor denied that the design would potentially affect water quality in any way despite the shade the boat shelter would cast on open water. Also according to Vittor, the Corps' permitting process is now much more rigorous than it used to be, particularly in the last five to six years.

On cross-examination, Vittor acknowledged that it takes approximately three years to establish a fully functioning marsh ecosystem and that sunlight is essential for plant growth. Vittor further conceded that he had performed no maintenance work on the Ono Island canal system specifically, although he had been involved in permitting and monitoring spoil-disposal sites on Ono Island. In addition, Vittor acknowledged that the original Corps permit and related construction drawings for the canal system stipulated that there would be intertidal

26

mounds within that system. Also according to Vittor, both the size of the boat shelter FFS had proposed -- "some sixty-foot tall and a hundred-foot long [sic]" -- and any resulting residential structure would cast significant shadows that, generally speaking, were not good for plant life. He stated, however, that his calculations indicated that the affected littoral shelf along the island's shoreline would still receive sunlight for approximately two-thirds of every day. Vittor did acknowledge that the construction necessitated by the boat shelter would noticeably widen the existing canal and would also create a right angle. Further, Vittor agreed that FFS's permit indicated that it would result in "disturbing 4,150 square feet of the canal water bottom."

FFS also presented rebuttal testimony from Friedman, who indicated that his current residence on a canal-fronting lot has two incised boat slips, which required dredging and vegetative replacement, but were nonetheless permitted and approved by both the Corps and the POA. Friedman further explained that, other than the boat shelter, no construction would occur along the shores of the island, because the proposed residence would be located in the center and the highest portion of the island.

27

After trial, the trial court subsequently entered a "Final Judgment" disposing of all pending claims in the POA's favor.[7] In particular, the trial court invalidated, based on the identified procedural deficiencies, the 1995 tax sale pursuant to which FFS had obtained ownership of the island and declared the POA as the island's owner. Additionally, it held that the island was expressly burdened by both the general covenants and the Unit 15 local covenants. It further held:

"… [E]ven in the event that the [general covenants and the Unit 15 local covenants] did not expressly burden [the island], the evidence overwhelmingly demonstrated that the Covenants impliedly burdened the [island] as an integral component of the common scheme of the Ono Island development based upon the patent intent of developer [Ono Development] as expressed in documents and its conduct over many years, as well as that of the POA and COA.

"… [W]ithout the authorization of the POA, through its [ACC], the Covenants prohibit the use and/or construction and/or alteration of the intertidal mounds, including but not limited to that proposed by FFS in this case: dredging and excavation of material from [the] canal and/or along the boundary or shoreline of an intertidal mound; the construction of a residential building and/or boat shelter and/or bulkheading, decks and finger piers by incision into and/or along the upland of an intertidal mound and/or canal; the alteration of the shoreline of an intertidal mound; and/or

---

[7]The trial court's judgment explained that it also resolved all of the parties' equitable claims and mooted the reserved legal claims.

28

any improvement, alteration, or use of the upland of [an] intertidal mound.

"… FFS, its successors and assigns, are hereby prohibited and permanently enjoined from making any modification or alteration or use of the [island] in violation of the Covenants."

Accordingly, the trial court permanently enjoined FFS and its successors and assigns from modifying or using the island in a manner inconsistent with the covenants. FFS appeals.

Standard of Review

The parties agree that our review is governed by the following well-established standard:

"'"Since this case was heard nonjury by the trial judge and decided by [him] as factfinder, the ore tenus rule applies."' Murphy Oil, USA, Inc. v. English, 333 So. 3d 641, 643 (Ala. 2021) (quoting Clardy v. Capital City Asphalt Co., 477 So. 2d 350, 352 (Ala. 1985)). '"There is thus a presumption of correctness in the trial judge's findings and [his] judgment based on those findings should not be disturbed unless palpably wrong, without supporting evidence, or manifestly unjust."' Id. at 643 (citation omitted). 'Nevertheless, we review the trial court's "conclusions of law or its application of law to the facts" de novo.' Id. at 643 (citation omitted). Questions concerning the sufficiency of the evidence are questions of law. See Sandoz, Inc. v. State, 100 So. 3d 514, 526 (Ala. 2012)."

29

Sirote & Permutt, P.C. v. Caldwell, 350 So. 3d 681, 685 (Ala. 2021).

Discussion

I.

Initially, FFS contends that the trial court erred in voiding the 1995 tax sale of the island to Hoang because, it says, the POA's challenge to a sale that occurred well over 20 years before was barred by the common-law rule of repose. See American Gen. Life & Accident Ins. Co. v. Underwood, 886 So. 2d 807, 812 (Ala. 2004) ("The common-law rule of repose … 'bars actions that have not been commenced within 20 years from the time they could have been commenced.'" (citation omitted)). As explained above and acknowledged in the POA's brief on appeal, the POA sought to either invalidate the 1995 tax sale of the island to Hoang or, based upon the 2020 quitclaim deed to the island from Hoang's predecessor in title, to redeem the island as provided for in §§ 40-10-82 and 40-10-83, Ala. Code 1975.

In First Properties, L.L.C. v. Bennett, 959 So. 2d 653, 655 (Ala. Civ. App. 2006), the Court of Civil Appeals summarized Alabama's redemption law:

> "Under Alabama law, after a parcel of property has been sold because of its owner's failure to pay ad valorem taxes

assessed against that property (see § 40-10-1 et seq., Ala. Code 1975), the owner has two methods of redeeming the property from that sale: 'statutory redemption' (also known as 'administrative redemption'), which requires the payment of specified sums of money to the probate judge of the county in which the parcel is located (see § 40-10-120 et seq., Ala. Code 1975), and 'judicial redemption' under §§ 40-10-82 and 40-10-83, Ala. Code 1975, which involves the filing of an original civil action against a tax-sale purchaser (or the filing of a counterclaim in an ejectment action brought by that purchaser) and the payment of specified sums into the court in which that action or counterclaim is pending. See generally William R. Justice, 'Redemption of Real Property Following Tax Sales in Alabama,' 11 Cumb. L. Rev. 331 (1980-81)."

959 So. 2d at 654 (emphasis added).

Section 40-10-82 provides:

"No action for the recovery of real estate sold for the payment of taxes shall lie unless the same is brought within three years from the date when the purchaser became entitled to demand a deed therefor …. There shall be no time limit for recovery of real estate by an owner of land who has retained possession. If the owner of land seeking to redeem has retained possession, character of possession need not be actual and peaceful, but may be constructive and scrambling and, where there is no real occupancy of land, constructive possession follows title of the original owner and may only be cut off by adverse possession of the tax purchaser for three years after the purchaser is entitled to possession."

(Emphasis added.)

Relying on the emphasized portion of the above statute, the POA suggests, contrary to FFS's claim, that neither its challenge to the tax

31

sale nor its action for judicial redemption were barred by the rule of repose. Although § 40-10-82 may apply to an action seeking to redeem property after a 20-year period, in the present case we need not reach either that issue or the related issue of possession because, as FFS correctly notes, the trial court granted relief solely on the basis of defects in the tax sale and never reached the issue of judicial redemption.[8] Contrary to the interpretation suggested by the POA, we see nothing in § 40-10-82 permitting a challenge to the underlying tax sale at any time, and the POA has produced no authority to that effect. In fact, the authority it does provide specifically suggests that § 40-10-82 "sets forth a limitations period as to an original owner's right to redeem real property under § 40-10-83." McLeod v. White, 45 So. 3d 360, 362 (Ala. Civ. App. 2010) (emphasis added). See also Gulf Land Co. v. Buzzelli, 501 So. 2d 1211, 1213 (Ala. 1987) ("We have stated many times that the purpose of § 40-10-83 is to preserve the right of redemption without a time limit, if the owner of the land seeking to redeem has retained possession." (emphasis added)).

---

[8]We express no opinion on whether the POA may redeem the island under § 40-10-82.

32

Regardless of the legality of the 1995 tax sale, it appears that an action challenging that sale could have been asserted when, in 1995, Hoang obtained title to the island as a result of the allegedly invalid sale. Accordingly, any claim challenging that sale expired 20 years later, in 2015, long before the underlying action was initiated. See Ex parte Liberty Nat'l Life Ins. Co., 825 So. 2d 758, 764 (Ala. 2002) (explaining that, unlike a statutory limitations period or a statutory repose period, the 20-year period prescribed by the long-standing common-law rule of repose, which arose within the context of property disputes, "begins to run against claims the first time those claims could have been asserted, regardless of the claimant's notice of a claim" (footnotes omitted)).[9] The POA's challenge to the validity of the tax sale was extinguished by the rule of repose. See Hinote v. Owens, 248 So. 3d 964, 967 (Ala. 2017) ("Unlike a statute of limitations, which extinguishes the remedy rather than the right, the rule of repose extinguishes both the remedy and the action itself."). Cf. Harrison v. Alabama Forever Wild Land Trust, 4 So.

---

[9]There is, as FFS notes, no suggestion that the sole recognized exception to the rule of repose, namely "a recognition of the existence of the claimant's right by the party defending against the claim," applies here. Boshell v. Keith, 418 So. 2d 89, 92 (Ala. 1982).

3d 1114, 1120 (Ala. 2008) (applying the rule of repose to bar an action seeking to quiet title to property). We therefore reverse that portion of the trial court's judgment purporting to void the tax sale and subsequently issued deeds and awarding title to the island to the POA.

II.

FFS also contends on appeal that the trial court erred in concluding that the island is both expressly and impliedly burdened by the covenants discussed above. Clearly, there is a dispute between the parties as to the application of the general and local covenants to the island in light of its omission from a recorded subdivision plat. This is true despite the fact that the island was transferred multiple times by deeds specifically referencing those covenants, including the deed by which OSJ, FFS's predecessor in interest, obtained title. See generally Bon Aventure, L.L.C. v. Craig Dyas, L.L.C., 3 So. 3d 859, 864 (Ala. 2008) (explaining that a deed transferring property "'subject to'" identified restrictive covenants was ambiguous to the extent that it did not specifically incorporate those covenants and because the covenants, which by their terms were inapplicable to the property, "were to become a new encumbrance on the property by operation of the deed" and resolving that

34

ambiguity in favor of the grantee by finding that the covenants did not apply). Regardless, because, like the trial court, we also find that the evidence established that the island is, at the very least, impliedly subject to the covenants, we pretermit consideration of whether those covenants are expressly incorporated by a deed.

As the POA points out in response to FFS's claim, this Court has, in certain circumstances involving a subdivision, recognized the existence and application of restrictive covenants by implication upon proof establishing "a common building scheme." Swanson v. Green, 572 So. 2d 1246, 1248 (Ala. 1990) (plurality opinion). See also Collins v. Rodgers, 938 So. 2d 379, 385 (Ala. 2006) ("Despite the disfavor with which Alabama law views implied restrictive covenants, this Court has enforced implied restrictive covenants under certain situations.").

The Court's opinion in Collins included an exhaustive review of the law on implied restrictive covenants in Alabama:

> "We begin by discussing Sanborn v. McLean, 233 Mich. 227, 206 N.W. 496 (1925), which, although not an Alabama case, is credited by some commentators as the original case finding an implied restrictive covenant in a subdivision setting. In Sanborn, a developer sold some lots in a subdivision and included in the deeds the restriction that the lots could be used for only residential purposes. At the time of those conveyances, the developer retained certain other lots

in the same subdivision. The developer later sold the retained lots, but the deeds to those lots did not include the restrictive language. Many years later, John McLean and his wife, Christine, purchasers of one of the unrestricted lots, attempted to build a gasoline service station on their lot.

"The Michigan Supreme Court concluded that the original developer intended to apply the same restrictive covenants to all the lots in the subdivision, including those retained by him and later conveyed by deed that did not include the restrictive language. The Court held that the implied restrictive covenant attached as an equitable burden on each of the lots retained by the developer, whether included as a restriction in the deed or not, and passed to each of the purchasers of those lots as an enforceable servitude. The plaintiffs in Sanborn v. McLean obtained an injunction to prevent the defendants from constructing a gasoline service station on a lot in the subdivision, even though the chain of title to the defendants' lot never expressly referenced or contained the residential restriction. …

"In 1928, the Alabama Supreme Court addressed the creation and enforceability of an implied restrictive covenant. In Scheuer v. Britt, 218 Ala. 270, 118 So. 658 (1928), the Court stated:

> "'Nor is it necessary that the restrictive covenant running with the land should be incorporated in the defendant's deed to take it out of the influence of the statute of frauds; the servitude may be laid on the property by a separate writing, to which he is not a party, if he is in privity with and claiming under one of the parties thereto, and has notice thereof.

> "'Here the servitude was laid on the property by the conveyance made by Brown, Duskin & Heilpern to complainant in pursuance of the

36

general scheme of improvement, affecting not only the lots conveyed to complainant, but unsold lots then held by complainant's grantors, including the lots afterwards sold to the defendant.

"'This doctrine is neither strange nor anomalous, as appears from the numerous authorities … and finds a striking analogy in the doctrine, often recognized by the court, that where the owner of land lays it off in lots, blocks, and streets, as a subdivision, and the sale of lots is made in reference thereto, and purchases are made on the faith of the act, this operates as a dedication of the street and gives the several lot owners an easement thereon, and this is so without reference to the statute.

"'On the other hand, it would be strange indeed to hold that one may lay off a subdivision for strictly residential purposes, as a general scheme of improvement, and sell and convey to numerous purchasers on the faith thereof, incorporating in their deeds restrictive covenants as to the use in pursuance of such scheme, that the promoters of the general scheme could destroy the scheme, to the detriment of such purchasers, by selling to others without such restrictions, when they had notice of such general scheme.'

"218 Ala. at 273-74, 118 So. at 662 (opinion on rehearing) (citations omitted).

"In Virgin v. Garrett, 233 Ala. 34, 169 So. 711 (1936), the Alabama Supreme Court again addressed implied restrictive covenants, affirming the trial court's order enjoining Jennie Virgin, Ira Virgin, and Pan American Petroleum Corporation from erecting a filling station or a storehouse on property adjacent to the complainant's residence. In that case, the

37

deeds to all of the properties in question contained the restrictive language, but the developer had attempted to subsequently record a written release of those restrictions. This Court stated:

> """One of the most practical tests, supported by common sense and common business experience, is, whether the restriction imposed by the grantor or proprietor upon the granted premises would naturally operate to enhance the value of his adjacent premises, whether retained by him or conveyed to another. If this be so, it is a strong circumstance to indicate that the restriction was not intended for the mere personal benefit of the grantor, but as a permanent servitude beneficial to the owner of the land, whoever he may be, and appendant to the premises. Parker v. Nightingale, 6 Allen [(88 Mass.)] 341, 83 Am. Dec. 632 [(1863)]. The reported cases are numerous, and almost infinite in their phases of variety, where tracts of land in cities are sub-divided into lots, and sold to separate purchasers, subject to restrictions as to the kind of occupations which may or may not be carried on upon them, and even as to the nature and dimensions of the buildings to be erected on the premises. The inquiry, in these cases, has generally been, whether the servitudes or restrictions imposed were of such a nature as to operate as an inducement to purchasers; and, if so, the inclination of the courts has been to construe them

> as appurtenant to the estate, and intended for the protection, rather than personal to the grantor. If appurtenant, it of course follows the land, being assignable with it, and each grantee can enforce it in equity against each other grantee having notice of it."'

"233 Ala. at 37-38, 169 So. at 713 (quoting <u>McMahon v. Williams</u>, 79 Ala. 288, 291 (1885)). The Court in <u>Virgin v. Garrett</u> also discussed the issue of notice of an implied restrictive covenant:

> "'When appellant purchased, she knew of the restriction on her lot in the deed from Cloverdale Homes, as well as in the other deeds, including that to her. But such knowledge is not of itself sufficient to show notice that the restriction when made by Cloverdale Homes was an appurtenance to lot No. 2. But before she purchased, Cloverdale Homes had executed and recorded a release and quitclaim deed reciting that it had sold and conveyed various lots and parcels containing restrictions as to their use and conveyance, and thereby released and quitclaimed to the respective owners of said lots all claims so reserved.

> "'This quitclaim deed being on record from one in the chain of appellant's title, in which it is shown that he had reserved an interest, is such as to convey to appellant notice of its contents when she bought lot No. 1, and it appeared upon her abstract of title. It was therefore both constructive and actual notice to her that this grantor had made conveyances of "various lots and parcels of land" with such restrictions. That was a suggestion to her to investigate and see if the deed to lot No. 2 of the same tract had such a restriction.

39

It was executed on a date next after the date of the deed to lot No. 1. That circumstance, and the knowledge that a filling station or storehouse would seriously affect the value of lot No. 2 for a dwelling house, and the presumption which we have quoted from <u>McMahon v. Williams</u>, [79 Ala. 288 (1885)], all serve to suggest further inquiry from the owner of lot No. 2 to ascertain whether the restriction in the deed to lot No. 1 was an inducement to the purchase of lot No. 2. Had such inquiry been made, she would have been so informed. She is chargeable as though she made it, and received the information. <u>A restriction may be a convenant [sic] or only a condition subsequent for the sole benefit of the grantor, but when it is imposed for the benefit of the owner of other property, it creates an easement for him, irrespective of its terms</u>. <u>McMahon v. Williams</u>, supra. We think, therefore, that appellee is entitled to an enforcement of the restriction against her.'

"233 Ala. at 38, 169 So. at 713.

"In the 1962 case of <u>Hall v. Gulledge</u>, 274 Ala. 105, 145 So. 2d 794 (1962), the Alabama Supreme Court held that <u>when an owner of a tract of land adopted a general scheme for the improvement of the land, subdivided that land into lots, and conveyed those lots with uniform restrictions, those restrictions created equitable easements in favor of the owners of all the lots</u>. …

"….

"'"'Where the owner of a tract of land adopts a general scheme for its improvement, dividing it

40

into lots, and conveying these with uniform restrictions as to the purposes for which the lands may be used, such restrictions create equitable easements in favor of the owners of the several lots, which may be enforced in equity by any one of such owners. Such restrictions are not for the benefit of the grantor only, but for the benefit of all purchasers. The owner of each lot has as appurtenant to his lot a right in the nature of an easement upon the other lots, which he may enforce in equity.

"'"'Whether such restriction creates a right which inures to the benefit of purchasers is a question of intention, and to create such right it must appear from the terms of the grant, or from the surrounding circumstances, that the grantor intended to create an easement in favor of the purchaser.'"

"'....

"'"In such cases the equitable right to enforce such mutual covenants is rested on the fact that the building scheme forms an inducement to buy, and becomes a part of the consideration. The buyer submits to a burden upon his lot because of the fact

41

that a like burden is imposed on his neighbor's lot, operating to the benefit of both, and carries a mutual burden resting on the seller and the purchasers."

"'....

"'"The question of law which exists in such cases is whether or not the grantor in the deed containing the restriction agreed expressly or impliedly that the restriction is for the benefit of the owner of the other property in [the] subdivision, whether it had been sold or not. Such a contract may be inferred from the circumstances and terms of the instrument, and need not be expressed either verbally or in writing. The test is said to be the intention of the grantor in creating the restriction.... That intention may be proven as is any other fact in the light of legal presumption or precedents."'

"Hall, 274 Ala. at 109-10, 145 So. 2d at 798.

"Twenty-eight years later, in Swanson v. Green, 572 So. 2d 1246 (Ala. 1990), the issue of implied restrictive covenants arose again. In Swanson v. Green, Charles and Mary Swanson, along with numerous other landowners in the Rolling Acres subdivision (collectively referred to as 'the Swansons'), sued Charles and Annie Green and W.C. and Shirley Holladay, all of whom owned land in the Rolling Acres subdivision. The Swansons sought to enjoin the Greens and the Holladays from engaging in commercial activity on their

42

property based on a restrictive covenant contained in previous bonds for title issued on all of their property.

"The evidence presented to the Court indicated that in 1971 the Holladays purchased one lot in the Rolling Acres subdivision through a bond for title. That bond for title included restrictive language providing that '[n]o commercial business shall be conducted on the property.' 572 So. 2d at 1247. The Holladays received a deed to the property in 1973. However, that deed did not include the restrictive language found in the bond for title, and the deed did not reference that restrictive language in any way. Both the bond for title and the deed issued to the Holladays were recorded in the proper probate office. At some point, the Holladays began operating an automobile-repair business on their property.

"In April 1971, T.S. and Emma Carpenter purchased a lot in the Rolling Acres subdivision through a bond for title. This bond for title contained the same restrictive language found in the Holladays' bond for title. It provided: 'No commercial business shall be conducted on the property.' 572 So. 2d at 1247. The Carpenters obtained a deed to the property in 1983; this deed, however, did not mention the restriction on commercial activities. In 1988, the Carpenters sold the property to Charles and Annie Green, conveying the property by a warranty deed, which was silent as to the restriction on commercial activities. The bond for title and the deed given to the Carpenters and the deed given to the Greens were recorded in the appropriate probate office. At some point after they purchased the property, Charles and Annie Green began operating a trucking business on and from their property.

"The Swansons sued the Holladays and the Greens, seeking to enforce the restrictive language contained in the bonds for title applicable to their property, arguing that those restrictions were as binding on the Holladays and the Greens as if the same language had been included or incorporated

43

into their deeds. However, the trial court disagreed. The Swansons appealed.

"On appeal, this Court affirmed the judgment of the trial court. This Court recognized that the presence of the restrictive language in the bond for title could not substitute for the absence of the restrictive covenant in the subsequent deed; it stated, '[A] deed, as a conveyance of title, is an entirely different instrument from a bond for title.' Swanson, 572 So. 2d at 1248. …

"The Swanson Court continued, however:

" 'Notwithstanding the failure of the deeds to restrict the Holladays' and the Greens' use of their property, the Swansons could still succeed if they can prove that there was a common scheme to so restrict commercial activity at the inception of the Rolling Acres subdivision. Generally, a common building scheme may be evidenced by: 1) universal written restrictions in all of the deeds of the subdivision; 2) restrictions in a substantial number of such deeds; 3) the filing of a plat showing the restrictions; 4) actual conditions in the applicable subdivision; or 5) acceptance of the actual conditions by the lot owners. 7 Thompson on Real Property § 3163, p. 124 (1962 repl. vol.).'

" 572 So. 2d at 1248."

938 So. 2d at 385-93 (Ala. 2006) (some emphasis added; footnotes omitted).

As demonstrated by the above caselaw, this Court has generally recognized, in certain situations, restrictive covenants by implication.

44

See also, e.g., Turner v. Clutts, 565 So. 2d 92, 94 (Ala. 1990) (plurality opinion) ("[U]nder the facts of this case, it is not unlawful or unreasonable for the restrictive covenants to be enforced. [The developer] imposed the restrictions for the purpose of protecting the investments of lot owners within the subdivision. In this respect, the covenants are similar to numerous others in this state that have been imposed to protect the integrity of planned residential developments."), and Hines v. Heisler, 439 So. 2d 4, 5 (Ala. 1983) ("We are not unmindful of the well settled rule that in construing restrictive covenants, all doubts must be resolved against the restriction and in favor of free and unrestricted use of property. However, effect will be given to the manifest intent of the parties when that intent is clear and the restrictions are confined to a lawful purpose within reasonable bounds, and rights created by the covenant have not been relinquished or otherwise lost." (emphasis added)). Although the Court ultimately did not find evidence of the required common development scheme in either Swanson or Collins, supra, we find the foregoing authorities to be determinative here. As set out above, the trial court specifically held that the overwhelming evidence demonstrated that the intertidal mounds located within the

45

canal system were, based on available documentation demonstrating the intent of Ono Development and the POA's long-standing administration and enforcement of the covenants, an "integral component of the common scheme of the Ono Island development." Applying the factors identified above, we agree.

Ono Development clearly undertook major construction to develop and market canal-fronting lots on Ono Island pursuant to the common scheme identified in its general covenants, which were intended to uniformly and universally apply. As demonstrated by those general covenants, which preceded construction of the canal system, the canal system -- including all of its components -- was purposely created as an integral part of the ensuing subdivisions common to and intending to benefit all property owners on Ono Island. Continuous canal health and access is clearly necessary to perpetuate that scheme and was also an inducement relied upon by purchasers of canal-fronting property.

Accordingly, the POA was tasked with enforcing the general covenants to preserve common amenities, including the canal system, and the general covenants called for the creation of the ACC to regulate construction on Ono Island's waters and contained restrictions that were

further perpetuated by the subsequent local covenants referenced in all related deeds. Thus, the island, created as part of and lying within the canal system, although unplatted within the adjoining subdivisions, neither exists outside the bounds of the common scheme of Ono Island nor was ever "abandoned," as FFS contends, so as to remove it from the purview of the authorities outlined above. Instead, after being created in perpetuation of that common scheme, it was omitted from one specific subdivision plat. Regardless, it is undisputed that, since its construction, the entire canal system, specifically including the island and the other intertidal mounds, has been consistently managed to ensure the success of that common canal system, as conditionally permitted pursuant to the original Corps permit, which permitting specifically addressed potential environmental concerns. The island has further been treated as if it is subject to the general and local covenants. Specifically, since the construction of the intertidal mounds, the POA has managed the mounds, including the island, as being subject to the general and local covenants to ensure their and the canals' pristine condition, which included never deeming the mounds as lots on which building is permitted.

47

In summary, it is undisputed that, regardless of its designation, suitability, and/or ultimate effectiveness for its intended purpose, the island was created as an integral part of the original canal system and has continuously and historically been managed as if it were subject to the general and local covenants without challenge by affected lot owners. Importantly, regardless of whether any property, including the island, was omitted from a specific recorded plat, it is also apparent that <u>all</u> of the deeds for properties in <u>each</u> platted subdivision on Ono Island incorporated the general covenants and applicable local covenants. Regardless, <u>all</u> the property on Ono Island, including the island and the other intertidal mounds, have been consistently managed as if they are subject to the covenants. See <u>Hines</u>, 439 So. 2d at 5-6 ("[R]estrictive covenants are to be construed according to the intent of the parties in the light of the terms of the restriction and surrounding circumstances known to the parties."). We find the principles discussed in <u>Collins</u> to be applicable in this case. Thus, we cannot conclude that the island has <u>no</u> covenants applicable to it.

Finally, Friedman, FFS's principal, owned other lots on Ono Island that were indisputably subject to these same restrictive covenants.

Specifically, he owns other canal-fronting property for which he had to obtain prior approval for construction. Also, before OSJ purchased the island, Friedman was notified by email concerning the POA's position regarding the prohibition of construction on the island and had constructive knowledge of <u>the language in the deed from Hoang regarding the applicability of the covenants</u>. In these circumstances and based on the record evidence, the trial court's findings that the general and local covenants govern use of the canal system by implication and that the canal system is subject to the control of the POA and the COA are not error. See <u>Caldwell</u>, supra. See also <u>Virgin v. Garrett</u>, 233 Ala. 34, 38, 169 So. 711, 714 (1936). To hold otherwise would permit a single property owner to destroy the common development scheme to the potential detriment of other similarly situated property owners despite clear notice of that apparent scheme, which was clearly intended to benefit all owners by providing continuous access to the common canal system.[10] See <u>Collins</u>, supra, and <u>Heatherwood Holdings, LLC v. First</u>

---

[10]The intertidal mounds were, as explained, indisputably constructed for a specific environmental purpose. As long as they remain uninhabited and unimproved, they may be adapted as needed to satisfy that purpose should changing environmental conditions occur.

Commercial Bank, 61 So. 3d 1012 (Ala. 2010). See also Turner, 565 So. 2d at 94 ("[U]nder the facts of this case, it is not unlawful or unreasonable for the restrictive covenants to be enforced. [The developer] imposed the restrictions for the purpose of protecting the investments of lot owners within the subdivision.").

Conclusion

In light of the foregoing, we reverse the portion of the trial court's judgment purporting to invalidate the 1995 tax sale to Hoang and to vest title to the island in the POA. We affirm, however, that portion of the trial court's judgment concluding that the island is bound by implied restrictive covenants governing its use. We remand the case for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Parker, C.J., and Bryan, Mendheim, and Mitchell, JJ., concur.